AO241
(Rev. 10/07)

17-1925

law2 Page 1

SECT. E MAG. 1

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED March -3 2017
WILLIAM W. BLEVINS
CLERK

**PETITION UNDER 28 USC § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: Eastern District of Louisiana |
|---|---|
| Name (under which you were convicted): **Dwight A. Bridges** | Docket or Case No: |
| Place of Confinement: **Rayburn Correctional Center Angie, Louisiana 70426** | Prisoner No: **488052** |
| Petitioner (include the name under which you were convicted) **Dwight A. Bridges** v. | Respondent (authorize person having custody of petitioner) **Robert Tanner, Warden** |
| The Attorney General of the State of Louisiana: **Jeff Landry** | |

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging:
   **22nd Judicial District Court**
   **St. Tammany Parish**

   (b) Criminal docket or case number (if you know): **531565 "H"**

2. (a) Date of the judgment of conviction (if you know): **09/18/2013**

   (b) Date of sentencing: **12/16/2013**

3. Length of sentence: **15 Years**

4. In this case, were you convicted on more than one count or of more than one crime? ☐ Yes ☒ No

5. Identify all crimes of which you were convicted and sentenced in this case:
   **Marijuana, Third Offense**

6. (a) What was your plea? (Check one)

   ☒ (1) Not guilty ☐ (3) Nolo contendere (no contest)

   ☐ (2) Guilty ☐ (4) Insanity plea

   (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? **N/A**

X Fee 5.00
__ Process
X Dktd
__ CtRmDep
__ Doc. No.

TENDERED FOR FILING
MAR 03 2017
U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury ☐ Judge only

7. Did you testify at a pretrial hearing, trial or a post-trial hearing?

☐ Yes ☒ No

8. If you did appeal from the judgment of conviction?

☒ Yes ☐ No

9. If you did appeal, answer the following:

a. Name of court: **Louisiana First Circuit Court of Appeals**

b. Docket or case number (if you know): **2014-KA-0777**

c. Result: **Affirmed**

d. Date of result: **03/06/2015**

e. Citation to the case (if you know): **La. App. Unpub. LEXIS 1092015**

f. Grounds raised: **See Attached Memorandum**

g. Did you seek further review by a high state court? ☒ Yes ☐ No

If yes, answer the following:

(1) Name of court: **Louisiana Supreme Court**

(2) Docket or case number (if you know): **2015-K-0675**

(3) Result: **Denied**

(4) Date of result: **02/26/2016**

(5) Citation to the case (if you know): **187 So.3d 467 (La. 2/26/2016)**

(6) Grounds raised: **Same as 9f**

(h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): **N/A**

(2) Result: **N/A**

(3) Date of result (if you know): **N/A**

(4) Citation to the case (if you know): **N/A**

10. Other than the direct appeals listed above, have you previously filed any petitions, applications, or motions concerning this judgment of conviction in any state court? ☐ Yes ☒No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of Court: **N/A**

(2) Docket or case number (if you know): **N/A**

(3) Date of filing (if you know): **N/A**

(4) Nature of the proceeding: **N/A**

(5) Grounds raised: **N/A**

(6) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes ☒ No

(7) Result: **N/A**

(8) Date of result (if you know): **N/A**

(b) If you filed any second petition, application or motion give the same information:

(1) Name of court: **N/A**

(2) Docket or case number (if you know): **N/A**

(3) Date of filing (if you know) **N/A**

(4) Nature of the proceeding: **N/A**

(5) Grounds raised: **N/A**

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☒ No

(7) Result: **N/A**

(8) Date of result (if you know): **N/A**

(c) If you filed any third petition, application, or motion, given the same information:

(1) Name of Court: **N/A**

(2) Docket or case number (if you know): **N/A**

(3) Date of filing (if you know) **N/A**

(4) Nature of the proceeding: **N/A**

(5) Grounds raised: **N/A**

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?
☐ Yes ☒ No

(7) Result: **N/A**

(8) Date of result (if you know): **N/A**

(d Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

(1) First petition: **N/A** ☐ Yes ☐ No

(2) Second petition: **N/A** ☐ Yes ☐ No

(3) Third petition: **N/A** ☐ Yes ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not: **N/A**

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution,. Laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground..

Caution: To proceed in the federal court, you must ordinarily first exhaust your available state-court remedies as to each ground on which you request action by the federal court. Also, if you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

**GROUNDS ONE THROUGH SIX: See Attached Memorandum**

(a) Supporting facts (do not argue or cite law. Just state the specific facts that support your claim.):

**See Attached Memorandum**

(b) If you did not exhaust your state remedies on Ground One, explain why:

**N/A**

(c) **Direct Appeal of Ground One:**

(1) If you appealed form the judgment of conviction, did you raise this issue? ☒ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: **N/A**

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☒ No

(2) If your answer to Question (d)(1) is "Yes," state: **N/A**

Type of motion or petition: **N/A**

Name and location of the court where the motion or petition was filed: **N/A**

Docket or case number (if you know): **N/A**

Date of the court's decision: **N/A**

Result (attach a copy of the court's opinion or order, if available): **N/A**

(3) Did you receive a hearing on your motion or petition? **N/A** ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? **N/A** ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue on appeal? **N/A** ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state: **N/A**

Name and location of the court where the appeal was filed: **N/A**

Docket or case number (if you know): **N/A**

Date of the court's decision: **N/A**

Result (attach a copy of the court's opinion or order, if available): **N/A**

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

**N/A**

(e) **Other remedies:** Describe any other procedures (such as habeas corpus administrative remedies, etc.) that you have Used to exhaust your state remedies on Ground One: **N/A**

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have presented in this petition been presented to the highest state court having jurisdiction? ☒Yes ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them: **N/A**

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, ground or grounds have not been presented, and state your reasons for not presenting them: **N/A**

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? ☐Yes No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available. **N/A**

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? ☐ Yes ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the raised. **N/A**

16. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing
**Sheila C. Myers**

(b) At arraignment and plea
**Sheila C. Myers**

(c) At trial
**Sheila C. Myers**

(d) At sentencing
**Sheila C. Myers**

(e) On appeal
**Sheila C. Myers**

(f) In any post-conviction proceeding
**N/A**

(g) On appeal from any adverse ruling in a post-conviction proceeding

**N/A**

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment that you are challenging? ☐ Yes ☒ No

(a) If so, give name and location of court that imposed the other sentence you will service in the future:

**N/A**

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain the one-year statue of limitation as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

**The statute of limitations has not expired in this case because petitioner's conviction became final February 26, 2016.**

---

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C ) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to case on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction of other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief:

**Petitioner Dwight A. Bridges requests this district court to vacate the conviction and sentence and remand the matter for a new trial.**

or any other relief to which petitioner may be entitled.

N/A
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system of 2-21-17 (month, date, year)

Executed (signed) on 2-21-17 (date)

[signature]
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DWIGHT A. BRIDGES, PETITIONER | DOCKET NO:

V

ROBERT TANNER, WARDEN
RAYBURN CORRECTIONAL CENTER | SECTION:

TENDERED FOR FILING
MAR 03 2017
U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

**APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C.A. 2254**

**BEFORE THIS HONORABLE EASTERN DISTRICT COURT:**

This petitioner, Dwight Bridges, is a Louisiana inmate currently housed at Rayburn Correctional Center in Angie, Louisiana following his conviction for third possession marijuana in violation of **La. R.S. 40:966E(3)**. Mr. Bridges petitions for a writ of habeas corpus under **28 U.S.C.A. 2254** in the United States District Court for the Eastern District challenging the constitutionality of his conviction.

Specifically, Mr. Bridges will show that the lower state court's adjudication of his constitutional claims resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Secondly, Mr. Bridges will show that the lower state court's adjudication of his constitutional claims resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

## 1. PROCEDURAL HISTORY

Dwight Bridges was charged in a bill of information filed by the St. Tammany Parish District Attorney's Office with possession of marijuana as a third offender. At the conclusion of a jury trial conducted in Division "H" of the 22nd Judicial District Court for the Parish of St.

Tammany on September 18, 2013, he was found guilty as charged. Mr. Bridges was subsequently sentenced to serve 15 years flat time in the custody of the Louisiana Department of Corrections as a second offender under the provisions of **La. R.S. 15:529.1**. Within thirty days of sentencing, Mr. Bridges filed a motion to reconsider sentence which was summarily denied by the trial court without a contradictory hearing. An objection was made to the court's ruling and Mr. Bridges then timely filed a notice for appeal.

On March 6, 2015, the First Circuit Court of Appeal issued its decision affirming both Mr. Bridges' conviction and the sentence imposed. He applied for a writ of certiorari and review to the Louisiana Supreme Court which denied review. State of Louisiana v. Dwight A. Bridges, Jr., 187 So.3d 467 (La. 2/26/2016).

## 2. STATEMENT OF FACTS

According to the trial testimony, St. Tammany Parish Deputies Michael Ripoll, Sr. and his trainer Edward Stone were on patrol January 5, 2013, when they noticed a blue Jaguar approaching them from the opposite direction on Highway 283. Though no radar verification was introduced at trial, they testified that they clocked the Jaguar, which was being driven by Dwight Bridges, as travelling at approximately 63 miles per hour in a 45 mile per hour zone.

The officers turned around and got behind Mr. Bridges and activated lights and siren, Mr. Bridges immediately pulled over to the side of the road. He rolled down the driver's side window and upon request, handed his driver's license to Deputy Ripoll who was standing at the driver's door of his vehicle. Mr. Bridges produced all the required driver documentation and complied with the officer's request to exit his vehicle and submit to a "pat down" of his person and the administration of a field sobriety test which he fully passed[1].

While Deputy Ripoll was at the driver's side of Mr. Bridges' car, Deputy Stone went to

[1] The officer offered no factual basis for why he chose to administer this test.

the passenger side of the vehicle which was unoccupied. He stated that while standing there, outside a closed window, he smelled the odor of raw marijuana. A canine unit was subsequently called to the scene and marijuana in plastic wrapping with a gross weight of 1.86 grams was alleged to have been found inside some paperwork contained in Mr. Bridges' glove compartment. Deputy Olivier, who reported to the scene with the dog Thor, testified that the glove compartment was opened when he arrived while Deputy Stone testified that the glove compartment was closed when Deputy Olivier arrived. Olivier stated he first smelled the marijuana when he opened the glove compartment after Thor's "alert."

Tiara Shobe, Mr. Bridges' girlfriend, was called as a defense witness. She identified a photo of Mr. Bridges' blue jaguar, as did the police, and testified that the car was parked in the parking lot outside the courthouse.

## 3. LAW AND ARGUMENT

### A. Standard of Review under 28 U.S.C. 2254

Generally, an inmate in state custody pursuant to the judgment of a state court must seek redress in the federal system by filing a petition for habeas corpus relief under 28 U.S.C. § 2244. et seq., the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). That statute, as amended by Congress in 1996, places exacting burdens on petitioners seeking such relief, both in terms of the procedural propriety and substantial merit of their claims. Section 2254 provides:

> "(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

"(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

The United States Supreme Court has made clear that the "unreasonable application" prong of section 2254(d)(1) permits a federal habeas court to "grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts" of petitioner's case. Williams v. Taylor, supra, at 413, 120 S.Ct. 1495; see also Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). In other words, a federal court may grant relief when a state court has misapplied a "governing legal principle" to "a set of facts different from those of the case in which the principle was announced." Lockyer v. Andrade, 538 U.S. 63, 76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (citing Williams v. Taylor, supra, at 407, 120 S.Ct. 1495). In order for a federal court to find a state court's application of United States Supreme Court's precedent "unreasonable," the state court's decision must have been more than incorrect or erroneous. See Lockyer, supra, at 75, 123 S.Ct. 1166. The state court's application must have been "objectively unreasonable." See, Williams v. Taylor, 529 U.S., at 409, 120 S.Ct. 1495.

**4. EXHAUSTION REQUIREMENT**

Pursuant to 28 U.S.C. § 2254(b)(1)(a), a petitioner seeking federal habeas relief cannot collaterally attack his state court conviction in federal court until he has exhausted available state remedies. 28 U.S.C. § 2254(b)(1)(A); Rose v. Lundy, 455 U.S. 509, 102 S.Ct. 1198 (1982); Minor v. Lucas, 697 F.2d 697 (5th Cir. 1983); Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir. 1999); Fisher v. Texas, 169 F.3d 295, 302 (5th Cir. 1999); Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998). "To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts." Wilder v. Cockrell, 274 F.3d 255, 259 (5th Cir. 2001) (internal

quotation marks omitted). Generally, the exhaustion requirement is satisfied only when the grounds urged in a federal application were previously presented to the state's highest court in a procedurally proper manner according to state court rules. Dupuy v. Butler, 837 F.2d 699, 702 (5th Cir. 1988). See Busby v. Drake, 359 F.3d 708, 723 (5th Cir. 2004) (holding that a petitioner must pursue his federal claims "through one complete cycle of either state direct appeal or post-conviction collateral proceedings.")[2] This is true even when review by that court is discretionary. O'Sullivan v. Boerkel, 526 U.S. 838, 119 S.Ct. 1728 (1999); Magouirk v. Philips, 144 F.3d 348, 360 (5th Cir. 1998). Moreover, in order to satisfy the exhaustion requirement, "the prisoner must fairly present his claim in each appropriate state court." Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347 (2004)(citation and internal quotation marks omitted)(emphasis added).

In the instant case, Mr. Bridges exhausted all claims contained within this writ of habeas corpus by fairly presenting the substance of each claim to each state court in a procedurally proper manner. **See Direct Appeal**: State Of Louisiana Versus Dwight A. Bridges, Jr. Court Of Appeal Of Louisiana, First Circuit 2015 La App Unpub LEXIS 1092015 La. App. Unpub. LEXIS 1092014 KA 0777 March 6, 2015, Judgment Rendered and State v. Dwight A. Bridges, Jr. 187 So.3d 467 (La. 2/26/2016). Thus petitioner has properly exhausted state court remedies.

## 5. BATSON CHALLENGE

### A. THE LOWER COURT ERRED IN DENYING DEFENDANT'S BATSON CHALLENGES AND THEREBY ALLOWED THE STATE TO IMPERMISSIBLY EXCLUDE POTENTIAL JURORS BASED ON RACE.

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court declared that a juror's race is "unrelated to his fitness as a juror." The Court explicitly ruled that the exercise of peremptory challenges based on race violated the Equal Protection Clause of the

[2] In Louisiana, the highest state court is the Louisiana Supreme Court. La. Const. of 1974.

Constitution and found that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." Batson at 87.[3] The Batson Court established a three part, burden shifting analysis for evaluating any challenge predicated on its ruling:

> Once the opponent of a peremptory challenge has made a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful discrimination. Purkett v. Elem, 514 US. 765, 767 (1996). [4]

In order to make a *prima facie* case of racial discrimination in the State's use of peremptory challenges, a defendant must establish three factors: 1) that the prosecutor's challenges were directed at members of a cognizable group; 2) that the challenges were peremptory rather than for cause; and 3) circumstances sufficient to raise an inference that the prosecutor struck the prospective juror for being a member of a cognizable group. According to controlling Louisiana jurisprudence, a *prima facie* case requires more than merely making a statistical comparison of the number of State challenges of African American jurors with the number of white jurors it challenged. State v. Dorsey, 74 So.3d 603 (2011); State v. Duncan, 802 So.2d 533 (2001). On the other hand, "...a pattern of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." (State v. Duncan citing

---

[3] In subsequent cases, the Court reaffirmed its commitment to non-discriminatory jury selection practices and further described the harm caused by the use of race-based peremptory challenges saying:

> Defendants are harmed, of course when racial discrimination in jury selection compromises the right of trial by impartial jury ... but racial minorities are harmed more generally, for prosecutors drawing race lines in picking juries establish "state-sponsored group stereotypes" rooted in, and reflective of, historical prejudice.
> Miller-El v. Dretke, 545 U.S. 231, 237-238 (2005) citing
> J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994).

[4] This procedure has been codified in Louisiana Code of Criminal Procedure Article 795 paragraphs C, D, and E.

Batson)[5]. In presenting a prima facie case, a defendant "is entitled to rely on the fact, as to which there can be no dispute that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." Johnson v. California, 545 U.S. 162, 169 (2005) (internal quotation marks omitted). The presence of one African American on a defendant's jury does not insulate the State from having a guilty verdict reversed because of the State's discriminatory exercise of peremptory challenges. State v. Dorsey citing State v. Tart, 672 So.2d 116, 141; *cert denied*, 519 U.S. 934 (1996).

Dwight Bridges is an African American male. From presiding over the contradictory pretrial hearing on the motion to suppress evidence, the trial court was aware that the State's case against Mr. Bridges rested entirely on the testimony of white law enforcement officers. Counsel for Mr. Bridges raised a Batson challenge after the prosecutor used peremptory challenges to strike two of the three African-Americans in the twenty-three person venire sent to Division "H" for his trial. (Trans. p. 606). As the Fifth Circuit noted in Price v. Cain, 560 F.3d 4 (U.S. 5th Cir. 2009), " … Batson intended for a prima facie case to be simple and without frills." all that a defendant making such a challenge needs to fulfill step one is "…show only that the facts and circumstances of his case give rise to an inference that the State exercised peremptory challenges on the basis of race." This [is] a "light burden." *Id.* See also: Johnson v. California, 545 U.S. 162 (2005). Given the "overt racial overtones of the case" State v. Draughn, 950 So.2d 583 (2007) and the fact that two of the three African-Americans had been cut—one by a surprise backstrike after having been previously accepted by the prosecutor—at the time when the first Batson challenge was raised, Mr. Bridges successfully met his "light burden." The trial judge tacitly found that a *prima facie* case had been established and correctly shifted the burden to the

[5] In this case, the prosecution struck 100% of the prospective African American jurors through the use of peremptory challenges.

prosecutor to provide a race-neutral reason for his decision to cut the two ladies, as required by the second step of the Batson analysis. (Trans. p. 606)[6]

Mr. Noriea stated that he cut Juror #309, Ms. Mary White, because she "was on two juries, and they were both defense verdicts, one was civil and one was criminal." (Trans. p. 606). His explanation for exercising a completely unanticipated backstrike against Juror #60, Ms. Alice Cousin, was that she "is a retired teacher's aid and I've never had any luck with teacher's aides." (Trans. pp. 606-607).

In contesting Mr. Noriea's explanation, counsel for Mr. Bridges pointed out that: 1) Ms. White had not said that she had voted "not guilty" in a criminal case as represented by Mr. Noriea; in reality, she reported with regard to the criminal case, "…they ended up settling before we actually went to trial." (trans. p. 542); and 2) though the prosecutor claimed he struck Ms. Cousin because she had been a teacher's aid, he had accepted a white woman, Ms. Erin Worrel (Juror #321) who was currently employed as a teacher's assistant. (Trans. pp. 530, 67-609) Counsel also voiced concern that Mr. Noriea cut Ms. Cousin by an unanticipated backstrike after having previously accepted her as a juror.[7]

---

[6] When a trial court requests that a party provide race-neutral reasons for a peremptory challenge without expressly ruling on the issue of whether the opponent of the challenge has set forth a *prima facie* case, a reviewing court may conclude that a *prima facie* case existed. State v. Collier, 553 So.2d 815, 819. n. 5 (1989)

[7] The trial court summarily dismissed defense counsel's objection to Mr. Noriea's use of a backstrike, saying, "Well first of all, Ms. Myers, let me indicate that you never inquired of the Court whether or not I would allow backstrikes. (Trans. p. 68). In actuality, prior to the commencement of trial, counsel, who was unfamiliar with the court's voir dire procedure, had engaged in the following colloquy with the trial court:

Court: …Anything else other than the issues that you have raised this morning that's pending?

Ms. Myers: No, Judge. I did wish to ask the Court, whenever it was appropriate, the manner in which the Court has the counsel exercise challenges in here.

Court: Oh, and I'll be happy to tell you how we do that. I put 20 in the box. We usually bring about 24 down, that's kind of what I'm guesstimating that I'll see down from the jury coordinator. We put 20 in the box, and then we put four on the front row and examine all of them at the same time. If there is—if there are more than 24, then I will just put 20 in the box, and we examine all of those 20 at the same time. And then normally what I do is when we get to the point

Mr. Noriea responded to defense counsel's rejection of his explanation concerning his strike of Ms. White by saying, "That's not what I understood her to mean, but be that as it may." (Trans. p. 607) He defended his strike of Ms. Cousin by stating, "I was actually thinking about striking Ms. Worrell as a backstrike because she's a teacher's assistant, and I'm not sure there is a difference." (Trans, p. 607).

Following the remarks of both counsels, the trial court again noted that defense counsel had not specifically inquired about backstrikes and then continued, "I find that based upon the information that Mr. Noriea has presented, that he has provided a sufficient explanation for the strike of Ms. White. However, I will not allow the strike of Ms. Cousin." (Trans. p. 609)

When the prosecutor exercised his one peremptory challenge to remove Juror # 80, Ms. Shannon Doughty, as the alternate juror, he removed the only other prospective African-American juror who had been called into Division "H" for Mr. Bridges' trial and defense counsel made a second Batson challenge. (Trans. p. 612). When asked to provide his reason for dismissing her, Mr. Noriea stated, "The only thing I wanted, Judge, I wanted to get Mr. Passman or Ms. Kristy Coco as better jurors than them." He then continued to state that Ms. Doughty had expressed similar negative feelings about third possession of marijuana being a felony as had Mr. Fontenette and Ms. Thompson (who were white and the last two prospective jurors on the venire list) and said that if he had gotten to them (which would have been impossible), he would have cut them also. He then pointed out that he had also cut Ms. Julie Young, who was white, for the same response. He concluded his explanation with the words, "So these four views, (sic) those

---

where we are ready to handle the challenges, I give the jury a break into the hallway and I instruct them they are not to discuss the case with each other or with anyone else for about five minutes so that we can do everything on the record in open court; everyone can sit where they are. And I call for challenges for cause from the State first, and then the defense. And then I start one by one with each potential juror to the State, then to the defense for challenges.

Ms. Myers: Thank you, Your Honor. I appreciate that. (Trans. pp.516-517)

whites and one Doughty, whatever her name is, are all the same and I would have challenged every one of them." (Trans. p. 612) The trial court found the prosecutor's explanation was "racially neutral" and allowed Ms. Doughty to be removed from the jury. (Trans. p. 613).

Though a trial court's Batson rulings are to be afforded great deference by a reviewing court (State v. Juniors, 915 So.2d 291, 316 (2003), in this case, the trial court's rulings which allowed the exclusion of Ms. White and Ms. Doughty were clearly erroneous given the totality of the circumstances in this case.[8] First, the trial court did not investigate defense counsel's allegation that Mr. Noriea had misrepresented Ms. White's statement. The court allowed her to be stricken saying, "But she did indicate that there was a verdict, I believe, in a medical malpractice case for the defendant." (Trans. p. 607) Had the court reviewed the court reporter's notes from the voir dire, it would have become obvious that the prosecutor was incorrect in reporting her statement about the verdict in a prior criminal jury case on which she had served. She had not returned a not guilty verdict in that case and, to the contrary, had actually reported that the case was resolved before the trial began.

In addition, Ms. White's exact words concerning the medical malpractice verdict were, "…the verdict came back for the defendant, not guilty." (Trans. p. 542). The phrasing of her answer certainly left open the possibility that "not guilty" had not been her individual verdict and as a result, ambiguity existed as to her personal verdict. The prosecutor never inquired if "not guilty" was her individual verdict. Given that there was no other similarly situated white juror with whom the court could evaluate the prosecutor's exercise or non-exercise of a peremptory challenge for the same reason to verify a consistent trial strategy on his part, the

[8] The clearly erroneous standard was articulated in Hernandez v. New York, 500 U.S. 352, 364 (1991); State v. Elie, 936 So.2d 791, 795 (2006).

court needed to look deeper into the reason given for the challenge.[9] If the trial court had checked and verified that Mr. Noriea was wrong in saying that Ms. White related she had voted not guilty in a prior criminal trial and then considered his nonchalant and dismissive response of "…be that as it may," when called to task by defense counsel, it most certainly would have been legally bound to have "grave concern" about the true intent of the prosecutor.

Finally, the prosecutor's race neutral explanation concerning Ms. White must be evaluated in light of his inconsistent conduct with regard to that explanation. The Supreme Court has explicitly recognized the importance of such comparisons, writing in Miller-El Dretke, 545 U.S. 231 (2005):

> More powerful…are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.
> *Id.* at 241.

The trial court failed to follow Miller-El. Mr. Noriea claimed to have cut Ms. White because of her "not guilty" vote in a civil (and to his error, criminal case) case but then struck Ms. Cousin (an African American) who had voted "guilty" in a rape prosecution. (Trans. pp. 542-543). Such action would certainly suggest that the proffered explanation was disingenuous.[10] Given all these circumstances, the prosecutor's race neutral explanation for Ms. White's exclusion was just not credible and the trial court should have reinstated her on the jury.

Though on its face, the reason given by the prosecutor for excluding Ms. Doughty as an alternate juror was race neutral (that, similar to three white prospective jurors, she had expressed

---

[9] Though Juror #286, Ms. Nancy Thompson (who was white), had served on a criminal jury (for charges of burglary and rape) that returned a not guilty verdict (Trans. pp. 544-545), she was the second to the last juror on the list of prospective jurors sent to the court and therefore she was never reached for consideration. (Trans. p. 524).

[10] In Snyder v. Louisiana, 552 U.S. 472, (2008), the U.S. Supreme Court instructed that if there were persisting doubts about racial motivation, a court reviewing a claimed Batson error would be "required" to consider the strike of one juror for the bearing it had on the strike of another.

negative feelings about third possession of marijuana being a felony), the challenge cannot be viewed in a vacuum. First, contrary to what Mr. Noriea said, Ms. Thompson had not expressed any difficulty with the nature of the offense and had responded, "No problem" when he asked her if she would have any issue with convicting Mr. Bridges of third possession of marijuana. (Trans. p. 565). Second, Mr. Fontenette and Ms. Young expressed much stronger views against the offense than Ms. Doughty did. Mr. Fontenette discussed how "in my opinion, it should be legalized … you have guys doing, you know, worse stuff than that, get off with murder and everything like that…I don't think it [third possession of marijuana] should be a felony" (Trans. p. 553). Later during voir dire, he expresses difficulty with the penalty being as high as twenty years. (Trans. p. 579) Ms. Young actually stated at one point that, "I can't do it [convict]. I would feel guilty, honestly." (Trans. p. 557) In contrast, Ms. Doughty said, "I would give you a fair chance to present your side." (Trans. p. 555) The negative opinions voiced by Mr. Fontenette and Ms. Young were explored at some length by the prosecutor while Ms. Doughty was the only juror expressing concerns about third possession of marijuana to whom Mr. Noriea put the following leading and confusing question, "And with that feeling, would you not convict somebody?" (Trans. p. 555) Finally, it must be noted that Juror #57, Mr. Steve Conravey, a white male, who stated that, "If I were in a position to change the law [regarding possession of marijuana], I probably would" (Trans. p. 559), was not further questioned by Mr. Noriea and was accepted by him as a juror. (Trans. p. 614)[11].

[11] As the Louisiana Supreme Court pointed out in State v. Knighten, 609 So.2d 950 (1992) where a prosecutor said he had excused a black juror because he had returned a "not guilty" verdict in a burglary trial but did not excuse two white jurors who had also returned the same verdict, "…courts have rejected explanations for challenges where the prosecutor failed to exclude other prospective jurors who were not of the racial group who shared the same characteristic as that claimed as the reason for the challenge," State v. Collier, 553 So.2d 815, 822 (1989) [omitted non-Louisiana cases that were also cited.]

In performing the third step of the Batson analysis, a trial court is required to critically examine the prosecutor's explanation and not just take whatever explanation he offers at face value. Had the court presiding over Mr. Bridges' trial performed a Miller-El comparison—rather than perfunctorily accepting the prosecutor's very disrespectful reference to Ms. Doughty when compared with how he referred to the white jurors who expressed stronger views than hers, it would have been bound to find that, more likely than not, impermissible racial discrimination was involved in excluding Ms. Doughty.

Application of these four factors considered by the Louisiana Supreme Court in State v. Draughn, 950 So.2d 583, (2007) also supports a finding that impermissible racial discrimination occurred in the use of a peremptory challenge against Ms. White, Ms. Cousin and Ms. Doughty, the only three African Americans in the jury venire. Mr. Bridges' case had overt racial overtones; the defense raised its Batson objections in a timely manner; the racial makeup of the jury does not negate a discriminatory intent on the part of the prosecutor and the trial judge did not consider any circumstances other than the stated reason given by the prosecutor. As the Supreme observed in Johnson, quoting from other cases, "[I]t does not matter that the prosecutor might have had good reasons…[w]hat matters is the real reason they [jurors] were excluded." *Id.* at 172. Had the trial court in Mr. Bridges' case considered all the relevant circumstances surrounding the striking of Ms. White and Ms. Doughty—and not just what the prosecutor said—especially in light of the court's reinstating Ms. Cousin to the jury after tacitly finding her removal to be racially motivated, it would have concluded that the reasons given for the exclusion of the two ladies were either "not legitimate or pretext."[12] Ruling on Ms. Cousin's exclusion in a manner favorable to the defense and on Ms. White's exclusion in a manner favorable to the State does not cure the error. The constitutional violation arising from the

[12] State v. Bender, 120 So.3d 867 (2013)

discriminatory exercise of peremptory challenges is not rectified by "splitting the baby" because in making a Batson challenge, "the defense is protecting the constitutional rights of both the defendant and the excluded juror…" State v. Bender, 120 So.3d 867, 871 (2013). As a result, the ruling of the trial court on the defendant's Batson challenges was clearly erroneous and his conviction should be reversed.[13]

**B. The State Court's analysis of this claim was unreasonable.**

The First Circuit Court of Appeals denied this claim because "defendant failed to produce evidence sufficient to permit the district court to draw an inference that discrimination occurred. Further, the State articulated legitimate race-neutral explanations for striking the minority jurors at issue. Accordingly, we find no abuse of discretion by the district court in its denial of defendant's Batson challenges regarding the prospective jurors White and Doughty. Thus, this assignment of error is without merit." State v. Dwight A. Bridges, Jr. 2015 La. App. Unpub. LEXIS 109, 2014 KA 0777 (La. 1st Cir. 3/6/2015).

As discussed above, there were only three African-Americans in the twenty-three person venire sent to Division "H" for trial, and the prosecution struck 100% of the prospective African-Americans jurors through the use of peremptory challenges and surprising backstrikes. The side by side comparison of all black venire panelists who were struck and the white panelists allowed to serve in this case, is the type of evidence the Court in Miller-El v. Dretke found to prove purposeful discrimination in a Batson challenge.

Particularly disturbing is the prosecutor's claim that he struck Ms. Cousin because she had been a teacher's aide, but he had accepted a white woman, Ms. Erin Worrel (Juror #321) who was currently employed as a teacher's assistant. (Trans. pp. 530, 67-609) The terms "aide"

---

[13] In Snyder v. Louisiana, 552 U.S. 472, 477 (2008), the Supreme Court utilized the clearly erroneous standard of review citing Hernandez v. New York, 500 U.S. 352, 369 (1991) which came before it as a result of a petition for habeas corpus filed by a defendant in federal court.

and "assistant" are interchangeable and the only difference between the two is that the aide was a black woman and the assistant was a white woman. Although he claimed he was unlucky with teacher's aides, he still allowed a white teacher's assistant to serve as a juror. The prosecutor's reasons for striking the African-American teacher's aide cannot be viewed as racially neutral when he allowed a similar white teacher's assistant to serve. The State court's analysis of this claim was unreasonable.

## 6. RIGHT TO PRESENT A DEFENSE

### A. BY PREVENTING MR. BRIDGES FROM PRESENTING THE ONLY DIRECT, DRAMATIC AND DEFINITIVE PROOF HE HAD THAT THE TESTIMONY GIVEN BY ST. TAMMANY PARISH DEPUTIES CALLED AS STATE WITNESSES WAS INCREDIBLE, THE TRIAL COURT VIOLATED HIS CONSTITUTIONAL RIGHT TO PRESENT HIS DEFENSE.

By virtue of the United States Constitution, any individual accused of a crime is guaranteed a right to present evidence tending to negate his guilt. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (Citations within quotation omitted) Crane v. Kentucky, 476 U.S. 685, 689-690 (1986) quoting California v. Trombetta, 467 U.S. 479, 485 (1984). Though legislatures are to establish rules governing the admissibility of evidence at criminal trials, statutes or procedural rules that impinge on the fundamental right to present a defense cannot withstand constitutional scrutiny. Washington v. Texas, 388 U.S. 14 (1967). (Statute prohibiting a defendant from calling principles, accessories or accomplices as defense witnesses violated the Constitution); Chambers v. Mississippi, 410 U.S. 284 (1973) (the "voucher rule" which prevented a defendant from impeaching a defense witness could not stand) Crane v. Kentucky, 476 U.S. 685, 689-690 (1986) (prohibiting a defendant from attempting to

show that his confession was unconstitutional) Rock v. Arkansas, 483 U.S. 44 (1987) (criminal defendant's constitutional right to testify cannot be barred by a per se rule against hypnotically refreshed testimony).

The fundamental right "to present a defense" is also ensconced in Louisiana constitutional law. La. Const. Art. I § 16. The Louisiana Supreme Court has clearly recognized that "It is difficult to imagine rights more inextricably linked to our concept of a fair trial, "State v. Van Winkle, 658 So.2d 196, 202 (1995). Because of this fact, the Court has declared that evidentiary rules may not supersede the fundamental right to present defense and it has not hesitated to overturn convictions in cases where a criminal defendant has not been allowed to present evidence at trial in support of his defense theory. The Court reversed the defendant's conviction in State v. Vigee, 518 So.2d 501 (1988) because he had been prevented from introducing evidence in support of his defense that he was not the owner of the Cadillac in which police located heroin and was merely sitting in the vehicle after having taken it for a test drive at the invitation of his friend who had recently purchased it from a man known to police as a heroin dealer. In State v. Gremillion, 542 So.2d 1074, 1079 (1989), the Court ruled that the trial court erred in prohibiting the defendant from showing that he did not inflict injuries upon the victim by introducing the victim's hearsay statement. Even though the statement did not fall within any recognized exception to the hearsay rule, the Court found that the defendant had the constitutional right to introduce the victim's statement that three men attacked him so that the jury could evaluate the credibility of his defense that a man named William Swain, along with two others, inflicted the victim's injuries.

The State's case against Mr. Bridges rested entirely on the credibility of three St. Tammany law enforcement officers. Two deputies claimed they stopped Mr. Bridges for

speeding. One then claimed that he smelled raw marijuana while standing outside the closed passenger window of his car. Mr. Bridges was removed from the vehicle and the deputies called a canine unit that, according to Canine Unit Deputy Olivier, routinely went to vehicle stops in St. Tammany Parish. He testified that, after arriving with his dog, he located a small amount of marijuana in the open glove compartment of the car, contrary to Deputy Stone's testimony that the glove compartment was closed when he called the canine unit.

The defense theory of the case was that the testimony of the three St. Tammany Parish Deputies could not constitute proof beyond a reasonable doubt because; 1) they contradicted each other on important points, 2) some of their described conduct (such as looking in the glove compartment and not searching the rest of the car or the trunk) was inherently illogical and, most significantly, 3) their claim of smelling raw marijuana, given the particular circumstances they alleged, was incredible. Counsel for Mr. Bridges clearly articulated this defense in his opening statement, telling the jury:

> …more significantly, you are going to be concerned about the inconsistencies that you are going to hear, and you are going to hear, and you are going to be troubled by contradiction.
>
> On top of that, you are going to be disturbed by an allegation that is impossible.
>
> As a result of all of that, Ladies and Gentlemen, you will not be convinced that the State has borne its burden and proven beyond a reasonable doubt that Mr. Bridges possessed marijuana that night….(Trans. pp. 642-643)

The contradictions in the deputies' individual testimony and the facts upon which to argue that their reported course of conduct was inherently illogical could be elicited and highlighted through cross examination. In contrast, the impossibility of their alleged ability to smell an extremely small amount of raw marijuana under the circumstances they described, could only be demonstrated by having the jurors stand in the exact position that Deputy Stone and Deputy Ripoll had placed in the closed glove compartment wrapped as they said it was on

January 5, 2013. Once able to effectively demonstrate the impossibility of the deputies' allegation, the defense would be able to effectively argue that the combination of inconsistent testimony, inherently illogical police action and proven untruthfulness on a critical point constituted reasonable doubt that Mr. Bridges actually possessed any marijuana on January 5, 2013, and therefore the jury was compelled to return a verdict of "not guilty".

The trial court denied the defense request noting that: 1) the exact scene on the highway could not be recreated—even though the same car and same drug and wrappings were available; 2) some jurors might not know what marijuana smelled like; and 3) "some consideration had to be given to the canine unit." (Trans. p. 721) Ultimately, the court ruled that "the prejudicial nature of this [defendant's evidence] would outweigh the probative value. (Trans. p. 722) This ruling constituted error because the evidence the defendant was trying to present was relevant and critical to his defense.

"The standard for determining relevance is based on logic and experience." State v. Caldwell, 504 So.2d 853 (1987). As long as the evidence has a tendency to make a consequential fact more or less probable, the logical relevancy test is satisfied. Clearly, evidence attacking the credibility of Officer Stone's testimony that he could smell 1.86 grams of raw marijuana wrapped in plastic and enclosed in the 8" by 11" folded paper receipt from a money order in the closed glove compartment of Mr. Bridges' car while he was standing outside the closed, front passenger window was relevant. It would have a direct bearing on the jury's decision whether to believe that he testified truthfully about other aspects of the case, particularly: stopping Mr. Bridges for speeding—when there was no corroborating evidence to support the charge and Mr. Bridges was never prosecuted for the offense—and, significantly,

whether the de minimus amount of marijuana in question was actually in Mr. Bridges' vehicle on January 5, 2013.

Without the jury being able to see for itself—by standing next to the closed passenger window with the State's evidence placed in the glove compartment as the officer said he found it on January 5, 2013—that the officer's testimony was completely incredible, defense counsel was prevented from both presenting a "complete defense" for Mr. Bridges challenging the truthfulness of the police testimony and from effectively arguing in closing that, since the police officers had not testified truthfully about a material fact, the jury was justified in disregarding their entire testimony. The jury would then be required by law to find Mr. Bridges "not guilty" because without the disregarded police testimony, the State would have failed to prove his guilt beyond a reasonable doubt.

The defense request for the jury to exit the courthouse and stand next to Mr. Bridges' vehicle following the testimony by Tiara Shobe, that Mr. Bridges' blue Jaguar had been parked in the courthouse parking lot would not have unreasonably delayed the proceedings, would not have caused logistical problems and would not have violated any provision of the Code of Criminal Procedure.

Finally, the trial court's ruling the defendant's request should be denied because jurors did not know what marijuana smelled like (Trans p. 721) was without merit. State witness Deputy Ripoll, who was at the driver's side window, testified that he did not know what marijuana smelled like but detected an "odd smell." Jurors would have been equally able to do so if, in fact, it was possible for any odor to escape from the small sealed package of marijuana allegedly located in the car's closed glove compartment. In addition, as both the exact car and exact marijuana and wrapping were present, whether the existence of any odor could be detected

would not be affected by the fact the car was in the courthouse parking lot instead of on the highway where the stop occurred. The court's ruling precluded the defense from presenting the only direct, dramatic and definitive evidence it had to prove that the arresting deputies' testimony was not credible. As such, the lower court's ruling improperly prevented Mr. Bridges from presenting his defense to the jury and constituted reversible error.

**B. The State Court's analysis of this claim was unreasonable.**

The First Circuit Court denied this claim because of the concerns expressed by the District Court, including the passage of time, inability to recreate the conditions existing on the night of the incident, and the possibility that jury members would not be able to identify the scent of marijuana.

As discussed above, State witness Deputy Ripoll, who was at the driver's side window, had testified that he did not know what marijuana smelled like but detected an "odd smell." The type of car Mr. Bridges was driving on the night of the incident was a late model Jaguar. The craftsmanship of these luxury vehicles does not allow for the seepage of odd smells to escape its interior. Had the Court allowed the jurors to stand outside the Jaguar with the marijuana inside the same glove compartment with the window rolled up, jurors would have been equally able to smell the odd odor, if in fact it was possible for any odor to escape from the small sealed package of marijuana allegedly located in the Jaguar's closed glove compartment behind the sealed passenger side window. In addition, as both the exact car and exact marijuana and wrapping were present at trial, whether the existence of any odor could be detected would not be affected by the fact the car was in the courthouse parking lot instead of on the highway where the stop occurred. Thus, the lower court's analysis of this claim was unreasonable.

## 7. FOURTH AMENDMENT VIOLATION

**A. BY ALLOWING THE STATE TO ELICIT TESTIMONY OVER DEFENSE OBJECTION THAT MR. BRIDGES DID NOT CONSENT TO A SEARCH OF HIS VEHICLE, THE TRIAL COURT COMMITTED ERROR BY ALLOWING IMPERMISSIBLE TESTIMONY CONCERNING THE DEFENDANT'S INVOCATION OF HIS FOURTH AMENDMENT RIGHT.**

During its redirect examination of Deputy Ripoll, the prosecutor asked the following argumentative question: "Now, I heard a lot of cooperation by the defendant. He cooperated with this; he cooperated with that; he cooperated with this. Is there anything he failed to cooperate with?" (Trans. p. 666). Anticipating the answer and its potential negative impact on Mr. Bridges in the minds of some jurors, defense counsel objected and at a bench conference, argued that the question was impermissible as it was intended to elicit a negative inference from the defendant's exercise of his constitutional right under the Fourth Amendment. (Trans. p. 666). Over defense objection, the trial court ruled that the question and the resulting answer were admissible because the defense had "opened the door" by her cross examination that revealed Mr. Bridges had cooperated with the deputies in immediately pulling over when they activated their lights, producing all requested documents, exiting his vehicle when instructed and submitting to the field sobriety test when asked to do so. (Trans. p. 666)

Though as of yet, appellant has not been unable to locate any Louisiana cases specifically addressing prosecutorial questions and comments on a defendant's exercise of his Fourth Amendment right to withhold consent to a search, the federal Fifth Circuit Court of Appeals has considered the issue. In United States v. Cooper, 714 F.2d 873 (5th Cir. 2013), the Court observed:

> We address Due Process concerns arising out of improper statements by the Government at trial using a two-step framework. We first assess whether the Government's statement was improper and then determine whether the statement "prejudiced the defendant's substantive rights." *United States v. Raney*, 633 F.3d

> 385, 394 (5th Cir. 2011) (quoting *United States v. Munoz*, 150 F.3d 401, 415 (5th Cir. 1998)). "The prejudice determination involves '(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt.'"
> *Id.* at 394 (quoting *United States v. Tomblin*, 46 F.3d 1369, 1389 (5th Cir. 1995)).

In Cooper's trial, the prosecutor asked one of its witnesses, a police officer who had been involved in the traffic stop that led to Cooper's arrest, whether he had "ask[ed] Mr. Cooper if he would give you a consent to search" his house. Defense counsel objected on the grounds that this constituted an impermissible inquiry into Cooper's invocation of his Fourth Amendment right not to consent to a search and the trial court sustained the objection. On appeal, Cooper argued that the very asking of the question required reversal of his convictions. The Court found no error because, in its words:

> Assuming that the Government's question, if answered, would have implicated Cooper's substantial rights, *see United States v. Runyan*, 290 F.3d 223, 249 (5th Cir. 2002) (assuming without deciding that a question regarding a defendant's refusal to consent to a warrantless search would raise constitutional issues, and noting that all other circuits who have addressed the issue have held that such a question does), we nevertheless hold that the question did not prejudice Cooper. Cooper's attorney objected before the Government's witness could answer the question, hence the jury never heard whether Cooper had refused permission for a warrantless search. The Government made no further mention of the request that Cooper consent to a warrantless search and certainly made no effort to encourage the jury to draw an inference as to Cooper's guilt on the basis of his refusal to give consent. We have previously held a similar question about a defendant's refusal to give consent for a warrantless search to be harmless error, despite having been actually answered by the witness, where "[t]he prosecution neither commented on [the defendant's] refusal to consent . . . nor asked the jury to draw any inferences from this refusal." *Id.* at 250.

Unlike Mr. Cooper's prosecutor, the prosecutor in Mr. Bridges' case sought to capitalize on every possible incriminating inference that might be wrongfully drawn from Mr. Bridges' exercise of his constitutional right. After asking what happened after Mr. Bridges "fail[ed] to let you search his car" (Trans. p. 667), the prosecutor proceeded to exclaim in an emotional voice during his rebuttal closing argument:

> Now, following the logic that the defense seeks to confuse you, defense says he didn't run. Any time—if you run, you are guilty. So running from the police is guilty. Yet, refusing to let the police search you're your car, shouldn't that indicate he knows he's guilty?... [Emphasis added.]
> (Trans. p. 748)[14]

This egregious argument cannot be harmless error in a case where the only evidence against Mr. Bridges was the testimony of law enforcement officers whose credibility was under attack by the defense. As such, in light of the particular circumstances of the violation, due process mandates that Mr. Bridges' conviction be reversed.

**B. The State Court's analysis of this claim was unreasonable.**

The First Circuit denied this claim after finding the officers' testimony established that the officers detected the odor of marijuana and did not need to obtain Defendant's consent to search the vehicle. As discussed above, the impossibility of the officers' alleged ability to smell an extremely small amount of raw marijuana under the circumstances they described is incredible and less than candid and minus the Court's finding the officers' testimony to be credible, the officers would not have had probable cause to search Mr. Bridges' vehicle. Thus, the State Court's analysis of this claim was unreasonable.

---

[14] Given that the State gets the last word in a criminal trial, defense counsel was unable to respond to this flagrant distortion of a fundamental constitutional right.

## 8. DAUBERT HEARING

**A. AFTER STATING THAT DEFENDANT'S REQUEST FOR A DAUBERT HEARING AS TO THE ABILITY OF THE STATE'S LAW ENFORCEMENT WITNESSES TO DETECT THE ODOR OF RAW MARIJUANA WOULD BE HEARD AT A LATER TIME, THE LOWER COURT ERRED IN NOT SUBSEQUENTLY ALLOWING THE HEARING ON THE DAY OF TRIAL ON THE GROUND THAT THE DEFENSE HAD NOT FILED A WRITTEN MOTION DUE TO RELIANCE ON THE COURT'S EARLIER RULING.**

On May 22, 2013, the trial court conducted a preliminary exam and hearing on the motion to suppress evidence pursuant to motions filed by the defense. When a deputy testified that he smelled marijuana while standing next to the passenger side of Mr. Bridges' car, defense counsel objected and requested a hearing, pursuant to the holding in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (5-22-13 Mot. Hear. Trans. p. 22-23). The trial court stated:

> "for purposes of today's motion, I'm going to allow the [officer's] testimony. Your objection is noted for the record, and we can have a Daubert hearing later on—on that issue prior to the trial in this case." (5-22-13 Mot. Hear. Trans. p. 22-23)

On September 18, 2013, prior to commencement of trial in case no. 532565, when the trial court inquired as to whether there were any matters that still needed to be resolved prior to trial, defense counsel advised the court that the Daubert hearing still needed to be conducted relative to the deputies' claimed ability to detect the odor of raw marijuana. (Trans. p. 511). The trial court refused to conduct the hearing on the ground that the defense had not filed a written motion relative to the hearing. Counsel; for Mr. Bridges advised the court that she had not done so based on her belief that, when she previously advised the court that she had not done so based on her belief that, when she previously advised the court on the record in open court of her desire to have such a hearing, the court had stated that it would do so at a later date and, based on this

statement by the court, she reasonably believed that the court had granted the defense request for the hearing. (Trans. p. 512) After the prosecutor commented that he did not believe the officer's testimony was "expert" testimony, the court also held that a Daubert hearing was not required as the testimony qualified as lay opinion testimony under Code of Evidence Article 701. Defense counsel objected to the court's ruling. (Trans. p. 516).

If the mere statement by a law enforcement officer that he or she detected the odor of marijuana is going to be deemed legally sufficient to justify a warrantless search of a vehicle in Louisiana, then fairness requires an acknowledgement that this situation creates a troubling potential for law enforcement abuse. To ensure that such an allegation does not become a routine police statement routinely made to support warrantless vehicle searches, it is critical for trial courts to perform a gatekeeping function whenever an officer claims to have the ability to detect the odor of marijuana, especially that of raw marijuana sealed in a wrapping. If trial courts fail to do so, a driver's Fourth Amendment right to privacy will always be trumped by the unexamined, self-serving allegation of a law enforcement officer that he/she smelled marijuana.[15] The trial court's refusal to conduct a Daubert hearing on the officers' ability to detect the odor of raw marijuana after previously having told the defense it would do so constituted error. Merely requiring that the State offer evidence during the officer's trial testimony to support the introduction of such testimony as lay opinion testimony was not a sufficient alternative because it did not address the issue of whether it was scientifically possible for a human to detect the odor of an extremely small amount of raw marijuana sealed in plastic and placed in a closed glove compartment when the person was standing next to the closed passenger car window.

[15] It is ironic that the State argued that the officer did not need to be an "expert" to detect the odor of marijuana but then later argued that the jurors should not be allowed to test the credibility of the officer's allegation by standing next to Mr. Bridges' car with the marijuana in it because they were not "experts".

**B. The State Court's analysis of this claim was unreasonable.**

The First Circuit found that the officer testified to the smell of marijuana based on his training and experience and was not presented in the form of an expert opinion. Thus, the Court concluded that no Daubert hearing was required.

A Daubert hearing was required in this case for a number of reasons. First, to ensure that officers allegations of smelling marijuana does not become routine; second, to ensure that drivers' Fourth Amendment right to privacy will not be trampled by unexamined, self-serving allegations of a law enforcement officer that he or she smelled marijuana; third, a Daubert hearing was particularly required to confront Deputy Ripoll's testimony where he testified that he was not trained or qualified to detect the smell of raw marijuana (Hr. Transcript pg. 465, line 3-8, May 22, 2013); and finally, a Daubert hearing was required to address the issue of whether it was scientifically possible for a human to detect the odor of an extremely small amount of marijuana sealed in plastic and placed in a closed glove compartment when the person was standing next to the closed passenger window of a late model jaguar. Thus, the State Court's analysis of this claim was unreasonable.

**9. PETITIONER'S HABITUAL OFFENDER TERM IS ILLEGAL**

**A. BECAUSE MR. BRIDGES HAD NOT BEEN INDIVIDUALLY "BOYKINIZED" WHEN HE ENTERED HIS GUILTY PLEA TO THE PREDICATE OFFENSE LISTED IN THE MULTIPLE OFFENDER BILL OF INFORMATION FILED AGAINST HIM, THE TRIAL COURT ERRED IN FINDING MR. BRIDGES TO BE A SECOND OFFENDER UNDER LA. R.S. 15:529.1.**

The defense filed a motion to quash the multiple bill of information filed against Mr. Bridges charging that he should be sentenced as a second offender under the provisions of La. R.S. 15.529.1. In order to view the transcript of Mr. Bridges' plea colloquy in case no. 374066 of the 22nd Judicial District Court, the defense had to apply for and receive a court order from

Division "H" as the record had been "sealed" for reason that were neither explained nor contained in the record of the case.[16] As stated by defense counsel in open court on December 16, 2013, the transcript of the plea colloquy revealed that Mr. Bridges was one of nine defendants who entered a guilty plea in an *en masse* proceeding. (12-16-13 Trans. p. 5) According to the plea transcript, the defendants were advised of their constitutional rights collectively as a group and then asked to respond to each question posed by the court one after the other, in sequence, when the judge called their name.

Such a procedure was not addressed, let alone sanctioned, in Boykin v. Alabama, 395 U.S. 238 (1969). The group plea procedural device has appeared in some jurisdictions purely for the convenience of the trial court. It is not authorized by the Louisiana Code of Criminal Procedure which specifically mandates in Article 556B that the judge "personally" addresses the defendant when he/she enters a plea of guilty."[17] As conducted, a group plea does not constitute a meaningful "personal colloquy" between the judge and the accused. Anyone who has ever witnessed a group plea occur can attest to the fact that as the number of defendants called to participate in a group plea increases, the attention and focus of defendants who are forced to stand for extended periods of time while the judge describes the elements of offenses that have no relevance to them decreases. Additionally, as the number of defendants in the group increases, the process becomes less personal and individual-focused and it encourages rote and repeated answers based on the answers given by the defendants preceding the next defendant called upon to answer. Boykin-critical questions are not individually posed to each person but

---

[16] Because of this fact, the defendant was not able to obtain a copy of the Boykin transcript or introduce a copy of it at the hearing on the motion to quash; however, the State specifically introduced without objection from the defense, the "entire record" of case no. 374066 into evidence "…in case the First Circuit wants to view that record to determine whether or not the plea is sufficient…" (Trans. pp. 798-799)

[17] This Court has specifically state that"…a personal colloquy between a trial judge and the defendant is preferred." State v. Verdin, 845 So.2d 372, 373 (1st Cir. 2003). The Louisiana Supreme Court has held that it will consider the issue of *en masse* guilty pleas on a case-by-case basis. State v. Filer, 762 So.2d 1080 (2000) quoting State v. Strain, 585 So.2d 540 (1991). See also: State v. Richard, 769 So.2d 1177 (2000).

are asked in general with each person asked to answer successively, as the judge goes down the list of defendants standing before her/him. Finally, even the physical appearance of the group[ plea negates the individualness of the plea process as each defendant becomes just another brief stop in an actual "plea assembly-line" series of repeated "yeses" or "nos" to a question the defendant may no longer remember by the time the judge reaches him or her. This is especially the situation in a case like Mr. Bridges where the judge took the pleas of nine defendants to separate offenses at the same time.

Mr. Bridges had just turned 18 at the time he entered his guilty plea in the predicate offense. At the time of his plea, the court did not advise him of his post conviction rights. The court also did not advise him that, in the event he had a subsequent felony conviction, his plea in the instant case could be used to enhance the sentence in the subsequent crime to a term of imprisonment beyond the statutory maximum set forth in the statutory sentence section of the subsequent crime if the District Attorney's Office chose to file a multiple offender charge against him. (12-16-13 Trans. p. 790)

The trial court rejected all three concerns raised by the defense and denied the motion to quash. (5-6-13 Trans. p. 792). Though the failure of an earlier trial court to inform a defendant of his right to post conviction relief and the possibility of sentence enhancement in the event of a future conviction have not been found to individually to constitute error sufficient to vacate a defendant's plea, the two errors combined with a group plea of nine defendants at the earlier plea rendered that proceeding defective and should have resulted in the quashing of the multiple bill filed against Mr. Bridges.

**B. The State Court's analysis of the claim was unreasonable.**

## 10. EXCESSIVE SENTENCE

**A. BY SUMMARILY DENYING MR. BRIDGES' MOTION TO RECONSIDER SENTENCE WITHOUT A HEARING AND SENTENCING MR. BRIDGES TO SERVE 15 YEARS FLAT TIME FOR THIRD POSSESSION OF A DE MINIMUS AMOUNT OF MARIJUANA UNDER THE SECOND OFFENDER PROVISION OF LA. R.S. 15:529.1, THE LOWER COURT COMMIT ERROR AND SUBSEQUENTLY IMPOSED A CONSTITUTIONALLY EXCESSIVE SENTENCE.**

In the motion to quash the multiple bill filed against Mr. Bridges, the defense argued that the sentencing range for a person convicted of possessing marijuana for a third time who was being sentenced as a second offender under La. R.S. 15:529.1 was excessive. On December 16, 2013, before imposing sentence on Mr. Bridges, the trial court voiced its thinking about the 10 to 40 year mandatory sentencing range that Mr. Bridges faced under the multiple offender statute which defense counsel contended was excessive by posing this question to her: "It's the law, though, isn't it?" (12-16-13 Trans. p. 9.) In reply, counsel for Mr. Bridges advised the court of the Louisiana Supreme Court's decision in <u>State v. Dorthey</u>, 623 So.2d 1276 (1983), holding that even though perfectly legal, a sentence may nonetheless be constitutionally excessive as applied to a particular defendant. (Trans. p. 9) Counsel elaborated arguing:

> … that really shocks the conscience, that someone could receive a sentence of 40 years [as a multiple offender for third offense possession of marijuana]. People have injured people. People have—we just heard on the news about the person who ran over four people in Texas and killed them; got probation. I mean, the people have shot people. People have done actual physical harm to people.
>
> The other thing, your honor, you know, Judge,…I was thinking about this when I was in your court last week and someone was being sentenced to a third offense shoplifting. For third offense shoplifting, which is a misdemeanor and enhanceable, for third offense shoplifting, goes [from zero to two years. Now, there you are stealing something that belongs to someone else. For third offense marijuana, in which arguably it could be said you are violating the law as it stands in Louisiana, you are certainly not causing harm to any other individual if you are

> not operating your vehicle or doing something where you might be intoxicated, and for that, the sentence is zero to twenty years.
>
> So it makes no sense of how you could steal from someone, be it a store or a person, the third time you are stealing from them and get only up to two years, but you could smoke marijuana, or not even smoke it, have it in your glove compartment, a small amount which was the fact in this case, and receive a sentence from zero to 20 years.

Defense counsel then concluded by pointing out that the issue under Article I, Section 20 of the Louisiana Constitution was not limited to a "cruel and unusual punishment" but included a prohibition against an "excessive" sentence which the potential penalty range for possession of third offense possession of an extremely small amount of marijuana was. The trial court failed to address the issue of excessiveness and denied the defendant's motion to quash the multiple offender bill, finding that the sentencing exposure range was not cruel or unusual (12-16-13 Trans. pp. 11-12). The defense objected to this ruling.

After the court sentenced Mr. Bridges to serve 15 years in the custody of the Department of Corrections (which means that he will have to serve 15 flat years, day for day), the trial court acknowledged Louisiana Code of Criminal Procedure Article 894.1 in general terms referencing sections (1) and (2) but articulated no facts supporting its reliance on these sections other than that Mr. Bridges also had a previous conviction for possession of a small amount of cocaine. The defense objected to the sentence and on January 8, 2014, filed a motion to reconsider sentence under the provisions of Louisiana Code of Criminal Procedure Articles 881.1 and 881.2.

In the motion, the defense reurged its Dorthey objection to the mandatory sentencing range for the offense under La. R.S. 15:529.1 and also argued that—as supported by the report attached to the motion—a black person in St. Tammany Parish was 3.2 times more likely than a

white person to receive a jail sentence for possession of marijuana.[18] Counsel also raised the issue as to whether black defendants charged with drug offenses in St. Tammany Parish were given the same alternative sentencing options as whites, especially since Mr. Bridges never once received probation or drug treatment but instead, received a jail sentence for every one of his possession of marijuana offenses, even though each one involved only a small amount of marijuana. On January 9, 2013, the trial court summarily denied the motion to reconsider sentence without affording Mr. Bridges a hearing at which he would have had the opportunity to present evidence in support of his allegations.[19] When counsel appeared in Division "H" on February 10, 2014, for a pretrial conference in Mr. Bridges' other marijuana case (no. 532332), counsel noted an objection to the court's January 9, 2014 ruling.

In reviewing a sentence for excessiveness, this Court must apply a two-pronged test:

> First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. There is no requirement that specific matters be given any particular weight at sentencing.
>
> ....
>
> Second, a sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering.
> State v. Fuller, 975 So.2d 812, n.1 (2nd Cir. 2008) [Citations within quotation omitted.]

Because the trial court denied Mr. Bridges a hearing on his motion to reconsider sentence at which he could have presented evidence in support of the allegations contained in the motion, he was denied the opportunity to demonstrate that the imposition of prison sentences for marijuana in St. Tammany Parish is affected by the defendant's race. In addition to this error,

[18] See pp. 17-21 of the report entitled The War on Marijuana in Black and White which was published by the ACLU in June of 2013, and made a part of the record in this matter.
[19] The trial court wrote "Motion Denied" across the proposed order setting a hearing date that was submitted with the motion.

the 15 year sentence imposed upon Mr. Bridges for the third possession of a small amount of marijuana meets the test for excessiveness. It is "grossly disproportionate" because, "when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice." State v. Weaver, 805 So.2d 166 (2002).

**B. The State Court's analysis of this claim was unreasonable.**

The First Circuit denied this claim after finding ample justification in the record for the fifteen-year sentence imposed on defendant, and a hearing on the motion to reconsider was not required. Accordingly, the Court held that the sentence imposed was not grossly disproportionate to the severity of the offense and, therefore, is not excessive. State v. Bridges, 2015 La. App. Unpub. LEXIS 109, 2014 KA 0777, (La. 1st Cir. 3/6/2015).

In an identical case, State v. Ladd 192 So.3d 235, the defendant argued that the sentence of seventeen years was excessive for possession of marijuana, third offense. The Fourth Circuit Court of Appeals noted that the record was completely void of any evidence that the trial court either ordered a PSI or gave the defendant an opportunity to present any mitigating factors to substantiate his claim for a downward departure from the statutory minimum sentence. Furthermore, the Court found that the trial court should have allowed the defendant to argue his basis for such a downward departure before resentencing defendant on remand. The Court remanded the matter to the trial court to conduct an evidentiary hearing on his motion to reconsider the defendant's sentence. State v. Ladd, 192 So.3d 235 (La. 4th Cir. 4/13/2016).

In the instant case, the Court should have also granted Mr. Bridges' motion to reconsider sentence and allowed him an opportunity to argue his basis for a downward departure. Because the lower court denied Mr. Bridges an opportunity to argue a downward departure, this federal court should remand Mr. Bridges' case, like the Fourth Circuit remanded Ladd's case.

The Louisiana Supreme Court offered a complimentary view in Ladd's case that fits Bridges' case. The Court stated "The laws nationwide are changing, as is public perception. [ ], [Ladd] would conceivably be in his forties before he is released. Although [Ladd's] seventeen year sentence is within the range of permissible sentences, on its face, the sheer harshness of the sentence shocks the conscience. We therefore find that further consideration of a downward departure from the mandatory minimum sentence is warranted. This result is clearly within the intent and spirit of *Dorthey* and subsequent jurisprudence." State v. Ladd, 192 So.3d 235 (La. 4th Cir. 4/13/2016).

Furthermore, the Court found that "La. R.S. 15:529.1, dramatically limits judges' ability to consider the human element and the life-time impact of harsh sentences on both defendants and their families, not to mention the State's economic interest. Sentences should be sufficient but not greater than necessary to meet the goals and expectations of sentencing. Is it deterrence? Is it punitive? Far too much authority has been usurped from judges under the pretext of appearing "tough" on crime and allowing the habitual offender statute to become what now appears to be an archaic draconian measure. Our State, Louisiana, has some of the harshest sentencing statutes in these United States. Yet, this State also has one of the highest rates of incarceration, crime rate and recidivism. It would appear that the purpose of the habitual offender statutes to deter crime is not working and the State's finances are being drained by the excessive incarcerations particularly those for non-violent crimes."

Likewise, in the present case, Mr. Bridges is a non-violent offender who was convicted for possessing a minute amount of marijuana; his prior convictions were also for possession of minute amounts of marijuana. Although his fifteen year sentence is permissible under the law and statutory mandate, the harshness of his sentence on a third offense marijuana conviction

shocks the conscience. Therefore, the lower court's analysis on the excessiveness of Mr. Bridges' sentence is unreasonable.

## CONCLUSION

The Court should grant Mr. Bridges' writ of habeas corpus.

Respectfully Submitted:

Dwight Bridges #488052
Rayburn Correctional Center
27268 Hwy. 21 N.
Angie, LA 70426-3030

DWIGHT A. BRIDGES # 488052
RAYBURN CORR. CTR.
27268 HWY 21, NORTH
ANGIE, LA 70426

US POSTAGE PITNEY BOWES
ZIP 70426 $ 006.65⁰
02 1W
0001393580 FEB 22 2017

Overnight Priority

UNITED STATES DISTRICT COURT
LORETTA G. WHYTE, CLERK
HALE BOGGS FEDERAL BLDG
500 POYDRAS ST. RM C151
NEW ORLEANS, LA 70130

PRIORITY MAIL
UNITED STATES POSTAL SERVICE™
WWW.USPS.GOV
LABEL 107R, OCT 1997

NOT CENSORED
Not Responsible for Contents
MAR 02 2017
RAYBURN CORRECTIONAL CENTER

UNITED STATES POSTAL SERVICE®
USPS TRACKING #
9114 9011 2308 6873 2493 45
Label 400 Jan. 2013
7690-16-000-7648

PROSE DIVISION